GEORGE M. KIDDER v. F. C. KENNEDY, G. W. KENNEDY, AND SAMUEL BROOKS.

*Trespass. Evidence. Deposition. Possession. Survey. Charge to Jury. Damages.*

A witness on behalf of the plaintiff in an action of trespass, in giving his deposition, stated what he did upon the lot in question while he held a deed of it, and testified to particular acts indicating a claim of title on his part, and to acts upon the lot which were unequivocal acts of possession ; and that in the temporary absence of his workmen who were building a house thereon, one Clough entered and commenced finishing the house, for which the witness brought an action of trespass against him, and added in this connection, "from the time I took my deed of said lot till I sold the same, my occupation was uninterrupted otherwise than by the trespass of said Clough." *Held* that the quoted portion was not obnoxious to the objection of being a statement of a conclusion of law and fact so as to render it inadmissible as evidence, taken in connection with the rest of the deposition, a correct construction having been given to it by the county court when objection was made to its admission at the trial.

There being some testimony tending to show an entry and possession by one Moses F. Colton, the defendant's counsel requested the court to charge "that no entry or possession of his which the evidence tended to prove prior to the defendant's entry and survey in October, 1849, was sufficient to give him any prior possession." But the court told the jury that previous to the deed of said Colton to F. D. Colton of Nov. 29, 1849, no possession was claimed on the part of the plaintiff that would be effectual. *Held* that this was a sufficient compliance with the request, as that deed was of later date than the defendant's survey.

The survey and record thereof made of the lot in question was evidence of a claim of title, not an act of possession. The cutting of small trees and bushes along the line, as convenience required in making the survey, did not change its character or legal effect.

There was evidence of claim of title by the defendants, but no proof of any acts of possession prior to a certain date, and it was conceded that there was no ground of claiming an abandonment of possession on the part of the plaintiff. *Held* that the defendants could not complain of error in the court submitting the question to the jury whether the defendants had abandoned their possession prior to that date, when it appeared that they had no possession to abandon.

As possession at the time an action of trespass is brought is not necessary to maintain the action, and as the question of possession at the time of the alleged trespass was one of fact upon evidence *pro* and *con ; held* it would have been error for the court to have instructed the jury that the plaintiff was not so in possession at either time as to enable him to maintain the action.

The evidence tended to show two entries by the defendants' servant and chopping of trees by him each time, and that he left upon being ordered off by the plaintiff after the first entry, but returned. The court charged the jury that if the plaintiff was entitled to recover, he was entitled to nominal damages for the first entry, and actual damages for the chopping done at the second entry. *Held* that in this there was no error of which the defendants had a right to complain.

THIS was an action of trespass upon lot No. 125, in Bolton. Plea, the general issue, and trial by jury, September term, 1869, Chittenden county, PIERPOINT, C. J., presiding.

It was conceded that the lot in question was left undivided in the original division of the town, and that neither party had derived any title from the original proprietors. The plaintiff introduced in evidence the plan of the town of Bolton, kept and used in the town clerk's office of that town; a deed of quitclaim of said lot, from Moses L. Colton to F. D. Colton, dated November 29th, 1849, and recorded 1849; the record of a survey of said lot, made by F. D. Colton, on the 7th of July, 1853, and recorded in 1853; the record of a warrantee deed of said lot (and other lands,) from F. D. Colton to Thomas Owens, dated May 21, 1857, and recorded in 1857; a warrantee deed of said lot (and others) from said Owens to the plaintiff, dated November 10th, 1864, and recorded on the 14th of the same month; a decree of foreclosure in favor of Hosea Spaulding against F. D. Colton, Thomas Owens and others, made at the April term, 1860, of the court of chancery for the county of Chittenden, and embracing the lot in question; a deed of quitclaim of lot 125 (and others) from Hosea Spaulding to Thomas Owens, dated March 25, 1863; the grand lists of the town of Bolton for the years 1850, 1851, 1857, 1858, 1859, 1860, 1861, 1862, 1863, 1864, 1865, 1866, 1867, 1868 and 1869, from which it appeared that said lot was set in the list to F. D. Colton in the years 1850, 1851, 1857, 1858 and 1859; to Thomas Owens in the years 1860, 1861, 1862, 1863 and 1864, and to the plaintiff since 1864; and the deposition of F. D. Colton.

*Moses D. Colton,* a witness introduced by the plaintiff, testified in substance that, in 1833, having discovered that the lot in question had not been drawn to the right of any of the original proprietors, he went on to it for the purpose of taking possession and traversed all its lines, they being indicated by marked trees. He then testified to having cut trees on it in 1835, and again in 1845, and to building a log shanty that year, and to cutting trees again in 1848 and 1849; but he did not remove the trees so cut in 1845, and 1848, or 1849; nor did he intend to do so when he cut them. From the time he first discovered the lot in 1833, to 1849, he was in the habit of visiting the lot yearly, and sometimes oftener, all the time claiming it as his own, and he made these visits and did the chopping upon the lot for the purpose of keeping up his possession.

After the conveyance to F. D. Colton, he and the witness for him were in the habit of visiting the lot once or more every year until it was conveyed to Owens, F. D. Colton all the time claiming to be the owner of it. In 1853, they cut trees on about one acre of the lot.

*Thomas Owens*, another witness introduced by the plaintiff, testified to cutting logs on said land after being conveyed to him, and testified to other acts of possession, which were detailed in the bill of exceptions, and that he claimed to be the owner of the lot.. Nobody besides himself made any claim to or use of the lot so far as he knew, and none of the Kennedys were ever on the lot, to the knowledge of the witness, while he claimed to own it.

The plaintiff testified to the condition of the lot when he bought it, and to his acts of possession, and that from the time the lot was conveyed to him, he has always claimed to own it, and has paid all taxes assessed upon it. He never saw any of the Kennedys on or about the lot, and, until he found Papineau chopping upon it, in March, 1867, he never knew of anything being done upon it, except what he did, and never knew or heard that anybody besides himself claimed any title to or interest in it. He had never intended to abandon the lot, but since it was conveyed to him has always intended to erect a mill upon it. The plaintiff introduced other witnesses who testified to his claims to said land, and acts of occupation, by himself and those in his chain of title.

Said *Papineau*, another of plaintiff's witnesses, testified : In the spring of 1867 I was employed by F. C. Kennedy to chop timber for a log house, on a mountain lot in Bolton, and was shown where to chop by Geo. W. Kennedy, who went with me to the lot, and told me to chop enough for a log house. After I had chopped awhile, the plaintiff came to me where I was at work, and told me he owned the land, and I must stop chopping or he would put me in jail. It was near sundown, and I stopped work and went home to Winooski, where F. C. Kennedy also resides. I there saw F. C. Kennedy the next day, and told him what plaintiff had said. Kennedy told me to go back and go to work, and I did so the next morning. This is the only chopping I ever did in Bolton for Kennedy, and no one worked with me.

The plaintiff also introduced evidence on the subject of damages.

### DEPOSITION OF F. D. COLTON.

That in October, 1845, and previously for about twenty years, I lived in Bolton, Vermont. On or about the 30th day of October, 1845, my father, Moses L. Colton, took possession of lot num-

ber 125, in Bolton, Vermont, which was then unoccupied and in a wilderness state, and had never been occupied by any one. My father, at that time, with the assistance of Elijah Hinkson and son and myself, cut the timber on about one half acre of land upon said lot, and erected a small log house thereon, with the design of permanently occupying said lot. My father, in or about 1848, made other improvements upon said lot by chopping timber for the purpose of clearing land upon said lot, and by building a fence around part of the lot for the purpose of permanently enclosing the same. Afterwards, I think on the 20th day of November, 1849, my father conveyed said lot by quitclaim deed to this deponent. From the time I derived title to said lot, for the space of some eight or ten years, and until I conveyed said lot by deed of warranty to Thomas Owens, of Whitehall, New York, I claimed said lot as my own. About June, 1853, I employed my father and his hired man to cut and pile the brush and small timber upon three fourths of an acre of land on said lot near a mill privilege, for the purpose of clearing the same. About the time last aforesaid I caused a surveyor to be procured, who traced the lines around said lot and re-marked the lines all around it. My father and several other hands assisted said surveyor in surveying said lot. About March, 1854, I procured my father to erect a log house on said lot, near said mill privilege, for the purpose of permanently occupying said lot. Thereafter, the said house was finished—all but the roof. The men who were engaged in building said house for me, in the spring of 1854, stopped their work upon said house, temporarily, but left their tools in said house, with the design of soon returning and of finishing said house. While they were absent one Clough took possession of said house, as a mere trespasser, and commenced finishing it. I brought an action of trespass, *quare clausum*, against said Clough. The suit was pending some time. (From the time I took my deed of said lot, till I sold the same, my occupation was uninterrupted otherwise than by the trespass of said Clough.) No other person, but myself, made any claim to said lot, during my occupancy of it, or previously, to my knowledge. After I built said house, to the best of my recollection, I cut and took off from said lot a large quantity of timber. During the time I owned said lot, to the best of my recollection, I paid the taxes that were assessed upon said lot.

To the passage enclosed in brackets the defendants objected. The objection was overruled, and the evidence admitted; the court, at the time, remarking that the statement objected to would be taken in connection with the other facts of the deposition and

would naturally be understood as referring only to such acts of possession as the deponent had testified to in other parts of the deposition. To the admission of this passage the defendants excepted. No instructions were given to the jury in the charge in relation to it.

The defendants put in evidence a quitclaim deed of the land in question, from Samuel B. Kennedy to B. E. B. Kennedy and the defendant F. C. Kennedy, dated January 24, 1851, recorded February 25, 1851; an original survey bill, dated October 20th, 1849 ; the record of said survey contained in a book without an index, used by the town clerk of Bolton, for recording the proceedings of town meetings, and the laying out of highways; the deposition of B. E. B. Kennedy, and the deposition of Thomas B. Hinkson.

B. E. B. Kennedy testified as follows : I am acquainted with the land in controversy in this suit. I first knew of this land in the early part of the summer, or the spring, of the year 1842. My father, Samuel B. Kennedy, who was, in that year, one of the assessors of real estate, for the town of Bolton, in the state of Vermont, had some time previously made the discovery that the land in question, (namely, lot one hundred and twenty-five, of the back lots, according to the original survey of the town,) had never been drawn to the right of either of the original proprietors of said town of Bolton, and that it had never been claimed by, nor assessed to any one, prior to the year 1842. My father immediately took possession of this lot, and caused it to be assessed to himself—he paying taxes upon it until about the time of the succeeding general assessment of real estate ; but at some subsequent time,—the date of which I cannot now state,—the listers for said town omitted to place this land in my father's list. Sometime in the year 1849, we discovered that this land had been listed by, I think, one Moses L. Colton, as his land ; but whether he had, at that time, quitclaimed to his son, Franklin D. Colton, I don't now recollect. As soon as we ascertained this, my father and myself went upon said land, and found no marks or indications of any persons having been upon said land, except those made by my father some years before. My father and I went upon said land nearly every year, and sometimes oftener, from 1842 to 1850, and cut trees upon it, in various places, for the erection of camping shanties, building sable traps, and for camp fires, &c. In the fall of 1849, when we learned that the Coltons

were endeavoring to get this land, my father directed me to make an accurate survey of the land, and cause a survey bill of it to be put upon record in the town clerk's office of Bolton. With the assistance of my brother, I made an accurate survey of said land, with compass and chain, running entirely around the land, and plainly marking the line trees around it, cutting down the trees and saplings along the line. At this time there were no evidences or marks, of any kind, indicating any acts of ownership or possession, excepting those made by father and myself, for him, as already stated. I examined the entire tract, particularly and minutely, and know that no other persons had performed any acts of ownership or possession, upon said land, of any kind whatever. My brother and I were upon this land, for the purpose of looking after it, very frequently. A year or two after this survey we found a partially constructed shanty or camp, made by some one, on an obscure part of said land, which we occupied and finally removed. This shanty had never been occupied, previous to this time, by any one, it being in an incomplete and unfinished condition, but the whole thing had, apparently, been abandoned. I know, from my own personal knowledge, that there was never any possession or occupancy of this land, in any form whatever, by either of the Coltons or any other person, except that of my father, as before stated, prior to the years 1851 or 1852, in one of which years, I cannot now say which, I erected a shanty on said land and remained there nearly two days. All the acts of possession and occupancy of said land, as before stated, by my father and myself and brother, were open and notorious during the whole period of time from 1842 to the time I was last upon said land, and of this both Moses L. Colton and Franklin D. Colton had repeated personal notices, both by myself and my father, and were forbidden going upon said land, or, in any way, meddling with it; and were informed by us that my father claimed the land by right of discovery and possession, and would seek to hold it against every one.

Thomas B. Hinkson testified to his father's taking possession of said lot, and that he was very secret and sly about it.

George W. Kennedy, one of the defendants, testified that at the request of F. C. Kennedy in March 1867, he set Papineau at work on lot 125, cutting logs for a house, and afterwards, before Papineau left, hired and set at work on the lot two other men, who partly finished the house, and then it was finished by another man employed by the witness. Samuel Brooks was put into the house as tenant of F. C. Kennedy, about May 1, 1867, and remained there until the injunction was served. After Papineau

commenced work, the possession of F. C. Kennedy was kept up every day, and the witness himself visited the lot six times or more during the time Papineau was at work there. B. E. B. Kennedy had charge of the lot until he removed to the west in 1858 or 1859, and then F. C. Kennedy requested the witness to look after it and see that the possession was not lost.

The defendants introduced several other witnesses whose testimony tended to support the foregoing evidence on the part of the defendants; and to show various acts of possession, and to contradict the testimony on the part of the plaintiffs.

The defendants requested the court to charge the jury as follows:

1. That in order to recover, the plaintiff must make out a title to the land as against the defendants, either by a prior possession, or by 15 years adverse, continuous and exclusive possession.

2. That no entry or possession of Moses Colton which the evidence tended to prove prior to the defendants' entry and survey of October 1849, was sufficient to give him any prior possession of any part of the lot, nor if it amounted to any possession at all, as it was not done under color or claim of title, could it be extended beyond the limits of Colton's actual occupancy, which did not embrace that part of the lot on which the trespass complained of in this suit occurred.

3. That S. B. Kennedy's entry and survey in 1849 and what he did at that time in connection with it, in marking the lines and corners, and cutting down the trees along the line, and recording the survey as stated in the defendant's evidence, especially in connection with such possession as the proof tended to show he had taken before, constituted such a possession in S. B. Kennedy as amounted upon the evidence in this case to a legal prior possession in him of the lot.

4. That there was no evidence in the case tending to show an abandonment of the possession of S. B. Kennedy.

5. That in order to defeat the prior possession of the defendants thus obtained, the plaintiff must establish a subsequent, adverse, continuous and exclusive possession in himself or his grantors for 15 years, or the possession of Owens could not be a prior possession.

6. That there is no evidence in the case tending to establish such a possession either in point of time or legal effect.

7. That, upon the evidence, the plaintiff was not so in possession of the lot at the time the trespasses complained of were com-

mitted, nor at the time the suit was brought, as to enable him to maintain this action.

The court declined so to charge the jury except so far as hereinafter stated, and charged substantially as follows, so far as the points embraced in the defendants' requests are concerned:

That it was conceded that neither party have any original title, and that the lot in question belonged to the original proprietors, as undivided land, unless one or the other of these parties has acquired it by possession.

That both have attempted so to do, and the question is, which has succceded best in accomplishing his purpose. That the plaintiff must show in this action that he has a better right to the land than the defendant has. That in such an action prior possession is enough to enable a party to maintain the suit as against a stranger. That a party, if in possession first, need not be in fifteen years in order to maintain an action against a stranger who has no title. That the question then was, which of these parties had the first possession, and this was for the jury to say. That it was claimed by the plaintiff, that in 1849 Moses Colton took possession. Colton says that in 1849 he went on and took possession, made an additional cutting to what he had made before, and began to put up a shanty. That about this time or soon after he conveyed the land to his son, and the deed was recorded. That this deed gave character to the son's acts afterwards. If he went on afterwards, this would indicate the extent of his claim, and would extend a very limited possession, in fact, to the boundary of his lot. Whatever possession Moses Colton had would pass to his son by this deed. That previous to the deed no possession was claimed on the part of the plaintiff that would be effectual. After Colton got his deed his possession would have a significance it had not before. The acts of F. D. Colton and of Owens in going on to the lot, cutting trees, wood, and timber, putting up, repairing and occupying the buildings, were unequivocal acts of possession; they are such as an owner would do. To keep up possession it is not necessary that a claimant who has a deed on record should go on every year and cut timber. He may not use the land for several years; still, if his acts indicate that he does not intend to abandon but intends to keep possession, his possession continues unless somebody else steps in and gets possession. F. D. Colton after this did not go on immediately, but in a year or two afterwards you find him there. When he took possession under his deed he may be regarded as in possession. Was Kennedy in possession at that time? Had he taken possession prior to

the time that Colton did ? This is a question for the jury. There is no evidence of any substantial possession on the lot at any early day. He kept up an oversight, occasionally going on to it. There would seem to be nothing you can place your finger on that would give him a possession. This continued till 1849. Then he goes on and makes a survey. This may be regarded as an act of possession, but this of itself was not sufficient to put him in possession. His surveying it and putting the survey on record was not enough. He must do more. He must keep it up by acts of possession, otherwise a mere survey cannot give him possession. His recording it would only give character to future possession. Of itself it would not be enough. It is conceded that this was made before the younger Colton took his deed and before he took possession. Did Kennedy follow it up ? That depends on what he did afterwards. What was the character of the acts he subsequently did ? Were they acts of possession ? They did nothing very important till they put the Frenchman on to cut in 1867. If there was no act of possession from the time they made the survey, were they then in the actual occupation when the trespass was committed ? or had they abandoned the possession ? If there was no subsequent act of possession after the survey, that would be evidence tending to show an abandonment of the possession, and if they abandoned it, they could get no benefit from the survey, and what they did at that time. The taking of a deed by the plaintiff and putting it on record would not be enough. The possession would be counted from the first act of possession. Did he have fifteen years possession after that ? If he took possession and held it fifteen years before defendants' trespasses, he would have a title. Did he abandon the possession after he took it ? Is there any evidence from which you can say he abandoned it ? The payment of taxes by Owens and the plaintiff from year to year, the care bestowed upon the property by them, and the payment of the decree by Owens, are evidence proper to be considered by the jury on the question whether or not they intended to abandon possession of the lot. The fact that Owens and Colton lumbered on the lot at the time and to the extent they state, is evidence to be weighed, if known to the Kennedys and not objected to by them, as showing that the Kennedys intended to abandon.

Which of these parties then was in possession when Papineau entered ? If Kidder was then in possession, and that had continued for fifteen years, the plaintiff is entitled to recover. If the plaintiff had not been in possession so long, and Kennedy was first in possession, then plaintiff cannot recover unless defendant had abandoned his possession. If under the foregoing instruc-

tions you find that the plaintiff is entitled to recover, he is entitled to recover for the first entry of Papineau nominal damages. And if you find that the plaintiff ordered Papineau off and he went, and the plaintiff re-entered and took possession of the lot, he is entitled to recover in this action for such damages as he sustained by reason of the chopping of Papineau between his first entry and the plaintiff's re-entry.

The jury returned a verdict against the defendants Kennedys for $12.50 damages, and in favor of defendant Brooks. The plaintiff did not claim to recover against Brooks, and the court directed a verdict in his favor.

To the omission of the court to charge the jury as requested, and to the charge as given on the points of the request, the defendants Kennedys excepted. The charge of the court upon the other points was not excepted to. The court fully explained the several propositions above stated to the jury.

*E. J. Phelps,* for the defendants.

*E. R. Hard,* for the plaintiff.

The opinion of the court was delivered by

PECK, J. The action is trespass upon lot No. 125 in Bolton. The plaintiff claims to recover by virtue of a possessory title or right in himself and those through whom he claims. In his chain of deeds showing color of title, is one from Moses L. Colton to F. D. Colton, dated November, 1849; a deed from F. D. Colton to Thomas Owens, dated May, 1857, and a deed from Thomas Owens to the plaintiff, dated November, 1864. In the deposition of F. D. Colton, introduced by the plaintiff to show, among other things, possession of the deponent under his deed, there is a passage, to the admission of which by the county court the defendants except. The deponent says, "From the time I took my deed of said lot till I sold the same, my occupation was uninterrupted otherwise than by the trespass of said Clough." The objection urged by the defendants' counsel against this portion of the deposition is, that what constitutes occupation, or occupation uninterrupted, is a conclusion of law and fact, to which it is not competent for a witness to testify; that the witness should state the facts, and leave

it to the court and jury to draw the conclusion. In some cases occupation of real estate is made up of a series of successive acts of possession ; and in other cases it is rather in the nature of a continuation of the same act ; but in either view we are not prepared to say that occupancy is so far a question of law as to render it incompetent for a witness to testify to it in general terms ; although, without some explanation as to the mode or character of the occupancy, such general statement would often be open to criticism as to the weight of the evidence. But the whole objection to this testimony rests on the assumption of the defendants' counsel that it is to be treated as independent evidence of an occupancy by the witness. But we put a different construction upon this paragraph ; a construction which we think appears quite obvious when taken in connection with the rest of the deposition. The witness had already stated what he did upon the lot under his deed, and had testified not only to particular acts indicating a claim of title on his part, but also to particular acts by him upon the lot, during that time, which were unequivocal acts of possession. He then stated that while men in his employ were engaged in putting up a log-house on the lot, having left their tools in the house, and being temporarily absent, one Clough entered and commenced finishing the house, for which the witness brought an action of trespass against Clough. When in this connection the witness proceeds and says, " From the time I took my deed of said lot till I sold the same, my occupation was uninterrupted otherwise than by the trespass of said Clough," he is not to be understood as testifying to any other or additional occupancy by him than that which he had already particularly described ; and it was admissible for the witness to allude to it as an occupancy, in his denial of any interruption except in that instance by Clough. This was the construction given to it at the trial, as indicated in the remark made by the presiding judge in overruling the objection. It is urged that the jury may not have so understood it, as the court gave no instructions on the subject in the charge. If the counsel feared the jury would give too broad a construction to it, they should have asked the court to notice it in the instruc-

tions to the jury. The exception is only to the admission of the evidence ; and it being admissible, there is no error.

It is insisted that the court erred in not charging the jury, as requested by the defendants' counsel, " that no entry or posses-sion of Moses Colton which the evidence tended to prove prior to the defendants' entry and survey of October, 1849, was sufficient to give him any prior possession." But the court told the jury that previous to the deed of Moses L. Colton to F. D. Colton of November 29, 1849, no possession was claimed on the part of the plaintiff that would be effectual. This was a sufficient compliance with the request, as that deed is of later date than the defendants' survey of October, 1849.

The county court gave all the effect to the survey of the lot in October 1849, by Samuel Kennedy, under whom the defend-ants claim, the re-marking of the lines and recording the survey, that they were entitled to. The cutting of some small trees and bushes along the line, as convenience required in making the sur-vey, did not change its character or add to its legal effect. It was an evidence of claim, but not an act of possession. As an evidence of claim of title, it would tend to characterize an act subsequently done upon the premises, as an act of possession, which might other-wise be regarded as but an act of trespass ; but it was not itself an act of possession. As the court told the jury, it did not have the ef-fect to put the plaintiff into possession. *Doolittle* v. *Linsley,* 2 Aik., 155, is cited to show that the survey and recording the survey bill is sufficient to constitute possession. In that case the plain-tiff recovered by virtue of prior possession. He had taken wood and timber from the lot from time to time for a number of years, under claim of title. But the language of SKINNER, Ch. J., is re-lied on as showing that the survey and recording amount to pos-session. SKINNER, Ch. J., says : " This actual survey of the lot, and the recording of the survey, as also of the deeds, &c., are not equivocal acts, but furnish clear and decided evidence of a claim of title ; the levying of the execution of the plaintiff, and thereby satisfying a debt to a large amount, and causing the record thereof to be made, is to be regarded in the same

light." This language is not used in reference to the question whether the survey bill recorded, or the levying the execution, were acts of possession; but solely in reference to the question whether there was sufficient evidence that the taking of the wood and timber by the plaintiff was under a claim of right, so as to give such acts the character of acts of possession; or whether they should be regarded as mere acts of trespass; the judge saying that if the acts and doings of the party are not such as to evince a claim of title, he must, of course, be regarded by all as a trespasser. The survey and record in that case were treated only as evidence of claim of title; and the county court gave the same effect to them in this case, and they are entitled to no more.

It is insisted that the court erred in submitting the question to the jury, whether the defendants had abandoned their possession prior to the entry of Papineau in March, 1867, and cutting the logs by direction of the defendants, for which entry and cutting the action was brought. It is insisted there was no evidence tending to show such abandonment; and that if there was sufficient evidence to submit to the jury, the charge on the point of abandonment was less favorable to the defendants than that to which they were entitled. The exceptions detail the whole evidence on the subject, and in the view we take of it, there was no evidence tending to show that either of the defendants, or those under whom they claimed, ever had any possession of any portion of the lot prior to the trespass by Papineau complained of in March, 1867. There is evidence of claim of title, but no proof of any act of possession. The defendants, therefore, cannot complain of error in the charge of the court on the question of their abandonment of possession, when it appears they had no possession to abandon. The case then stood entirely on the question of the plaintiff's possession; and a possession by the plaintiff at the time of the trespass complained of was sufficient. This the jury have found. There was no claim at the trial, and it is conceded by the defendants' counsel in argument that there is no ground to claim, that there was any abandonment of possession on the part of the plaintiff.

The defendants' seventh request was to instruct the jury that upon the evidence the plaintiff was not so in possession of the lot at the time the trespasses complained of were committed, nor at the time the suit was brought, as to enable him to maintain this action. Possession at the time the writ was brought was not necessary. The question of possession at the time of the trespass complained of being one of fact upon competent evidence, it would have been error to have charged the jury according to this request.

The question made by defendants' counsel as to the rule of damages is not within any exception taken by the defendants at the trial; but if it were, there is no error on this point of which the defendants have a right to complain.

Judgment affirmed.